**Opinion filed May 21, 2026**



## In The

# Eleventh Court of Appeals

_____

## No. 11-25-00357-CV

_____

## IN THE INTEREST OF B.E.S.D. AND T.D.G., CHILDREN

**On Appeal from the 326th District Court**

**Taylor County, Texas**

**Trial Court Cause No. 11266-CX**

### M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from the trial court's order terminating the parental rights of the mother and fathers of B.E.S.D. and T.D.G.[1]  The mother and B.E.S.D.'s father appealed.[2]  On appeal, each parent challenges the sufficiency of the evidence to support the trial court's findings that termination of that parent's parental rights is in the best interest of their respective children.  *See* TEX. FAM. CODE ANN. § 161.001(b) (West Supp. 2025).  We affirm the trial court's order.

---

[1]To protect the identities of the children, we use pseudonyms or initials to refer to the them.  *See* TEX. R. APP. P. 9.8(b).

[2]T.D.G.'s father did not appeal.

## I. *Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. *Id.* To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1), and that termination is in the best interest of the children. *Id.* Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the trial court found that clear and convincing evidence established that: (1) the mother knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) the mother engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; and (3) termination of the mother's parental rights is in the children's best interest. *See id.* § 161.001(b)(1)(D), (E), (b)(2). Additionally, the trial court found that clear and convincing evidence established that: (1) B.E.S.D.'s father knowingly placed or knowingly allowed B.E.S.D. to remain in conditions or surroundings which endangered his physical or emotional well-being; (2) B.E.S.D.'s father engaged in conduct or knowingly placed B.E.S.D. with persons who engaged in conduct which endangered his physical or emotional well-being; (3) B.E.S.D.'s father constructively abandoned B.E.S.D., who had been in the permanent or temporary managing conservatorship of the Texas Department of Family and Protective Services (the Department) for not less than six months, and despite the Department's reasonable efforts to return B.E.S.D. to the father, he did not regularly visit or maintain significant contact with B.E.S.D., and demonstrated an inability to provide B.E.S.D. with a safe environment; and (4) termination of his

2

parental rights to B.E.S.D. is in B.E.S.D.'s best interest. *See id.* § 161.001(b)(1)(D), (E), (N), (b)(2).

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (first quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); and then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied).

With respect to the best interest of the children, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547

(Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Department is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). Additionally, the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the children's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the children's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the children. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the children, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet. denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of a parent's parental rights is in the children's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the children may recur in the future if the children are returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Moreover, the factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness by the parent to meet the children's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

## II. *The Evidence Presented at Trial*

The mother's history with the Department began in 2007. By March 2019, when she gave birth to her fifth child, B.E.S.D., she had been investigated by the Department over ten times for, among other things, marihuana use during her previous pregnancies and while in the presence of her children. The mother's four daughters were removed in 2016; the two oldest children remained in the custody of their paternal grandmother, and her two younger daughters, five-year-old D.W. and three-year-old A.M.W., lived with their father.

When B.E.S.D. was born, both he and the mother tested positive for marihuana. The mother admitted to the responding Department investigator that she had smoked marihuana while pregnant, but justified her marihuana use by comparing it to smoking cigarettes or drinking alcohol, which she also did while pregnant. The mother then became evasive and refused services. The investigator

5

attempted to interview B.E.S.D.'s father at the hospital, who refused to answer questions or submit to drug testing. Because of the potential dangers in the parents' home and concerns about the mother's "inability to change [her] behavior," the Departrment sought and was granted temporary managing conservatorship of B.E.S.D.

In May 2019, the mother's younger daughters, D.W. and A.M.W., were in a car with their father when he was arrested for driving while intoxicated after smoking PCP. D.W. and A.M.W. were removed and could not be placed with the mother because "she had an open CPS case." The mother testified that the Department provided couseling for her in an effort to assist her in the children's return to her care.

The relationship between the mother and B.E.S.D.'s father ended soon after B.E.S.D.'s birth. According to the mother, B.E.S.D.'s father "was drinking a lot and putting his hands on [her]." The physical abuse began in 2018 and continued while she was pregnant with B.E.S.D. The mother continued to smoke marihuana after B.E.S.D. was removed because, according to her, she was "stressed and overwhelmed" because she "was done with [B.E.S.D.'s] dad and dealing with [the Department]." B.E.S.D.'s father moved out of the mother's home, the mother achieved a short period of sobriety, and B.E.S.D. was returned to the mother's care in early 2020. A month later, B.E.S.D.'s father physically abused the mother in her home in the presence of D.W., A.M.W., and B.E.S.D, and he was arrested. The mother participated in family-based safety services (FBSS)[3] from June 2020 to May

---

[3]"Family-based safety services are protective services provided to a family whose children are not in the conservatorship of the Department." 40 TEX. ADMIN. CODE pt. 19 ch. 700 subch. G div. 2 § 710 (2021). The Department's Child Protective Services Division provides family-based safety services to families and children "to: (1) protect the children from abuse and neglect; (2) help the family reduce the risk of future abuse or neglect; and (3) prevent the removal of the children from their home." *Id.*

2021 and tested negative on her drug screen in April 2020 to avoid another removal of her children.

The mother's sixth child, T.D.G., when born in August 2023 tested positive for marihuana; the mother also tested positive for marihuana the same day. She began dating T.D.G.'s father in 2022, and admitted to smoking marihuana with T.D.G.'s father before and during her pregnancy with T.D.G. Once again, the Department opened an FBSS case for the parents. B.E.S.D.'s father was confined in the Taylor County Jail at that time, and he was subsequently transported to Louisiana and imprisoned. T.D.G.'s father—a suspected methamphetamine user who had daily access to the children—refused to participate in services or sign a safety plan.

In September 2023, the mother and B.E.S.D. tested positive for marihuana, and T.D.G. tested positive for methamphetamine and marihuana. Based on the parents' unwillingness to make positive behavioral changes, the Department sought and was granted temporary managing conservatorship of D.W., A.M.W.,[4] B.E.S.D., and T.D.G. on November 29, 2023.

The Department created family plans of service for the mother and the fathers of B.E.S.D. and T.D.G. B.E.S.D.'s father "was incarcerated for a large part of the case," then moved to Colorado at some point after his release from prison. B.E.S.D.'s father had not seen B.E.S.D. since 2021 or 2022. Permanency case manager Rebecca Myles contacted B.E.S.D.'s father to facilitate services and drug testing, but he refused to participate in services and blamed the mother and the Department for his lack of contact with the child. T.D.G.'s father also ignored Myles's contact attempts and did not engage in services.

---

[4]The termination suit involving D.W. and A.M.W. was severed into a separate cause number on February 22, 2024.

Meanwhile, the mother was successfully discharged from counseling and her parenting program. She also completed an inpatient drug treatment program at Serenity House around January 2024. By November 2024, because the mother had substantially complied with her service plan requirements and had tested negative for all prohibited substances for several months, the Department initiated a transition to monitored return. But the monitored return was terminated after the mother tested positive for methamphetamine in January 2025. When Myles asked the mother about her drug test results, the mother claimed that it was a "false positive[]." The mother later revealed that she and T.D.G.'s father were intimate in January 2025, and she surmised that she was exposed through T.D.G.'s father's methamphetamine use.

The Department and the trial court afforded the mother another opportunity for reunification in May 2025 through a second monitored return. At that time, the mother was four or five months pregnant with N.G., her second child with T.D.G.'s father. Around a month into the monitored return, the mother allowed T.D.G.'s paternal grandparents to have possession of T.D.G., who in turn permitted contact between T.D.G. and his father in violation of the trial court's order. Despite her knowledge of the unauthorized contact between T.D.G. and his father in June 2025, she did not notify the Department. The mother tested positive for marihuana in July and T.D.G. tested positive for methamphetamine in August, and the second monitored return was then terminated.

The final termination hearing commenced on October 17, 2025, and concluded on October 31, 2025. The mother was present, but B.E.S.D.'s father did not appear for the hearing on either date. On the second day of the hearing, B.E.S.D.'s father's attorney explained that he was hospitalized in a mental health institution in Colorado and could not physically appear.

8

The mother testified that she gave birth to N.G. on October 7, ten days before the final hearing commenced. For the first time, neither the mother nor her newborn tested positive for marihuana at childbirth. Although the mother and N.G. tested negative at the hospital, a Department investigator contacted the mother based on her significant history of drug use and exposing her children to drugs. The Department was unable to implement a safety plan with the mother's suggested safety monitors, who were either not appropriate or had violated previous safety plans by allowing the mother unsupervised possession of the children. Consequently, N.G. was removed on October 21.

The mother further explained that she had been smoking marihuana since 2004, and "didn't see really [sic] a problem with it" until recently because she "believed it was just a plant." The mother continued using marihuana throughout the Department's involvement for the preceding eighteen years, including during her pregnancies, because "[i]t was just a big stress reliever to smoke." According to the mother, the last time she smoked marihuana was the day before she went to Serenity House in December 2023. She testified that she had been sober "almost two years," and no longer wanted to expose her children to marihuana. But when asked why, she responded, "I have no idea."

At the time of the final hearing, B.E.S.D. and T.D.G. were living in an adoptive foster home. They were placed there upon removal and went back after the monitored return ended. Myles testified that B.E.S.D. and T.D.G. had "been through tremendous amounts of trauma and change," but "[their] foster family love[d] them very much and absolutely ensure[d] that every need that they ha[d] [was] met." Myles opined that it was in the children's best interest to terminate each parent's parental rights. She explained:

> [T]he Department . . . worked with [the mother] for several years and [gave] her every opportunity to make the changes necessary to achieve . . . successful family reunification. Unfortunately, she ha[d]

9

not been able to exhibit the ability to keep her children safe, whether it [was] from choosing to use drugs herself or exposing them to romantic partners or other people that [were] using drugs.

At the conclusion of the hearing, the trial court terminated each parent's parental rights and found termination to be in the best interest of their respective children. *See* FAM. § 161.001(b)(1)(D), (E), (N), (b)(2). This appeal followed.

### III. *The Best Interest of the Children*

Each parent challenges the legal and factual sufficiency of the evidence to support the trial court's findings that termination of that parent's parental rights is in the best interest of their respective children. "'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Giving the requisite due deference to the trier of fact, we hold that, based on the evidence in the record and the application of the *Holley* factors, the trial court could have formed a firm belief or conviction that termination of each parent's parental rights was in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas

10

2015, no pet.) (quoting *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at \*6 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.)). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest[] of the child[ren]." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of the children's best interest. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28).

Neither parent contests the trial court's endangerment findings under Sections 161.001(b)(1)(D) and (E), and B.E.S.D.'s father does not challenge the trial court's additional finding as to him, that he constructively abandoned B.E.S.D. pursuant to Section 161.001(b)(1)(N). So long as the evidence supports those findings, they are valid grounds for termination. *See E.C.R.*, 402 S.W.3d at 249–50; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *J.S.*, 687 S.W.3d at 552. In this regard, evidence that each parent endangered the children and that B.E.S.D.'s father constructively abandoned B.E.S.D. could be considered by the factfinder in determining whether termination is in the children's best interest. *See E.C.R.*, 402 S.W.3d at 249–50; *C.J.O.*, 325 S.W.3d at 266.

A. *T.D.G.'s Father*

Significantly, the evidence shows that B.E.S.D.'s father chose not to engage in services, physically abused the mother in the presence of the children, had made no attempt to contact B.E.S.D. since 2020, and failed to appear for either day of the final termination hearing. *See E.C.R.*, 402 S.W.3d at 249 (a parent's failure to complete court-ordered services can support a best interest finding); *In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) ("A fact finder may infer from a parent's failure to take the initiative to complete the services required to regain possession of his child that he does not have the ability to motivate

himself to seek out available resources needed now or in the future."); *see also In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) ("Physical violence in the home leads to an unstable and unpredictable environment for children."). It is well-established that a parent's criminal activity, "especially [a] history of domestic violence in front of the [c]hildren, supports the trial court's best-interest finding." *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). And because of his criminal conduct both in Texas and beyond our borders, he was repeatedly incarcerated throughout B.E.S.D.'s life. *See In re A.M.*, No. 11-25-00253-CV, 2026 WL 545550, at *7 (Tex. App.—Eastland Feb. 27, 2026, no pet.) (mem. op.) (Any criminal activity that exposes the parent to the potential for incarceration is relevant to the best interest analysis.).

Moreover, the evidence permitted the rational inference that B.E.S.D.'s father was aware of the mother's marihuana use during her pregnancy. "[A] parent's knowledge of the other parent's drug use during pregnancy and corresponding failure to attempt to protect the unborn child from the effects of that drug use can contribute to an endangering environment." *J.W.*, 645 S.W.3d at 749.

B.E.S.D.'s father exhibited a pattern of blatant parental indifference and abusive behavior toward the mother, even in front of the children, which supports a finding that termination of his parental rights is in B.E.S.D.'s best interest under each of the *Holley* factors. *See In re A.J.D.-J.*, 667 S.W.3d 813, 823 (Tex. App.—Houston [1st Dist.] 2023, no pet.); *see also In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) ("Stability and permanence are paramount in the upbringing of children.").

Accordingly, we overrule B.E.S.D.'s father's issue on appeal.

B.  *The Mother*

The mother, for her part, demonstrated her own pattern of indifference through her years of ongoing drug use, which "implicates most of the *Holley* factors." *In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied).  It is well-established that a parent's continuing pattern of drug use can support a best interest finding because of the "attendant risks to employment, housing, and prolonged absence from the children." *In re R.R.A.*, 687 S.W.3d 269, 279–81 (Tex. 2024); *see also J.A.R.*, 696 S.W.3d at 257 (The parents' years of drug use supported the trial court's best interest finding.).  The mother testified that she had been advised of the dangers of exposing her children to drugs by "quite a few" Department caseworkers and investigators throughout their years of involvement with her.  The Department opened numerous FBSS cases to provide the mother with counseling and other services.  Notwithstanding the Department's efforts, the mother used marihuana while pregnant with six of her children, including B.E.S.D. and T.D.G.  *See In re R.R.L.*, No. 11-25-00263-CV, 2026 WL 616107, at *7 (Tex. App.—Eastland Mar. 5, 2026, no pet.) (mem. op.) (Courts may look to a parent's treatment of other children in the family in deciding whether that parent engaged in a course of conduct that endangered the child, which is likewise relevant to the best interest analysis. (citing *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.))).

The mother's marihuana and alcohol use during her pregnancies "supports a finding of direct injury to the child[ren]." *In re A.V.*, 697 S.W.3d 657, 659 (Tex. 2024) (relating to the trial court's endangerment findings).  And her decision to engage in illegal drug use during the pendency of a termination suit when she was at risk of losing her children is indeed contrary to the children's best interest.  *See J.S.*, 687 S.W.3d at 551; *In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied).

13

Furthermore, after the mother claimed that she and B.E.S.D.'s father ended their relationship, she allowed him into her home with her children present despite his violent propensities. *See O.E.R.*, 573 S.W.3d at 905. She also failed to appreciate the danger inherent in allowing T.D.G.'s paternal grandparents to have unsupervised periods of possession of T.D.G. The mother knew that they were informed that T.D.G.'s father tested positive for methamphetamine, but denied knowledge of his drug use. Notably, T.D.G.'s paternal grandparents were considered by the Department as a potential placement for the children in 2024, but they were not approved after a home study was completed. The mother nevertheless allowed T.D.G.'s paternal grandparents to have possession of T.D.G.; predictably, they permitted unauthorized contact between T.D.G. and T.D.G.'s father, after which T.D.G. tested positive for methamphetamine.

Even after N.G. was born, the mother sought to temporarily place N.G. with the paternal grandparents before the Department removed the child. The mother's repeated disregard for the children's safety permits the inference that she is unable to meet the physical and emotional needs of the children. *See In re U.G.G.*, 573 S.W.3d 391, 402 (Tex. App.—El Paso 2019, no pet.) ("In reviewing the parenting abilities of a parent, a fact finder can consider the parent's past neglect or past inability to meet the physical and emotional needs of the children.").

We recognize that the mother voluntarily admitted herself into Serenity House and claims to have maintained sobriety since December 2023. While "recent improvements made by [the parent] are significant, evidence of improved conduct, especially of [a] short-duration, does not conclusively negate the probative value of a [parent's] long history of drug use and irresponsible choices." *J.O.A.*, 283 S.W.3d at 346; *see also N.T.*, 474 S.W.3d at 479 ("[R]ecent improvement alone is not sufficient to avoid termination of parental rights." (quoting *In re K.D.C.*, No. 02-12-

00092-CV, 2013 WL 5781474, at \*16 (Tex. App.—Fort Worth Oct. 24, 2013, no pet.) (mem. op.))).  This is especially so in this case.

The mother admitted that she knew T.D.G.'s father was an unsafe person for her children to be around and suspected that he was still using drugs.  Nevertheless, she instead chose to be intimate with him in January 2025.  She tested positive for methamphetamine the same month, yet failed to inform the Department of her encounter with T.D.G.'s father.  The mother then, "[o]ut of fear," concealed that T.D.G.'s father had access to T.D.G. in June 2025, who also subsequently tested positive for methamphetamine.  The mother consistently showed a willingness to endanger her children to avoid Department scrutiny and prioritized her own interests over the safey of her children.  *See In re A.H.*, 679 S.W.3d 817, 830 (Tex. App.— El Paso 2023, pet. denied) (The mother's voluntary admission to an inpatient program after removal does not counteract her history of relapses and "pattern of decline upon receiving children back into her care.").  Although the best interest of the children shall always be the primary consideration, a parent's purported sobriety is inconsequential if she continues to endanger her children.  *See* FAM. § 153.002.

Given the child-centered focus of the best interest inquiry, we do not discount or minimize the children's positive strides since removal.  *See J.W.*, 645 S.W.3d at 747; *Holley*, 544 S.W.2d at 371–72.  When children are too young to express their desires, the factfinder may consider whether the children have bonded with their caregivers, are well-cared for by them, and whether the children have spent minimal time with a parent.  *In re E.J.M.*, 673 S.W.3d 310, 334 (Tex. App.—San Antonio 2023, no pet.); *see also In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (evidence showing that a young child had bonded with the foster family supported the trial court's best interest finding).  At the time of the final hearing, B.E.S.D. was six and T.D.G. was two, and there was no evidence presented as to their desires.  But, based on the record, the children were "extremely bonded"

15

to their foster parents who met all their needs and hoped to adopt them. In the care of the foster parents, B.E.S.D. attended weekly counseling and play therapy, was "blossoming at school," and "[h]is behaviors [were] improving drastically."

The mother, by contrast, showed a clear disinterest in protecting her children for most of their lives, which posed an emotional and physical danger to the children now and in the future and showed an unwillingness or inability on her part to meet the children's needs now and in the future. *A.J.D.-J.*, 667 S.W.3d at 823; *see Holley*, 544 S.W.2d at 371–72. The record shows multiple circumstances from which the trial court could have reasonably discerned a "pattern of conduct that is inimical to the very idea of child-rearing." *J.F.-G.*, 627 S.W.3d at 316 (quoting *C.H.*, 89 S.W.3d at 28); *Holley*, 544 S.W.2d at 371–72. Accordingly, the mother's acts and omissions indicated that the existing parent-child relationship between her and her children, B.E.S.D. and T.D.G., is not a proper one, which supports the trial court's best interest finding. *See Holley*, 544 S.W.2d at 371–72.

In this instance, the State honored the constitutionally protected relationship between the mother and her children until it became clearly and convincingly apparent that her primary interest was not the protection of the children. *See A.V.*, 113 S.W.3d at 361. Years of resources were exhausted in an effort to keep the children in the mother's care; she pushed reunification efforts to their outermost limits and showed that she is not "fit to accept the accompanying responsibilities" of parenthood. *See id.* She was given countless opportunities to properly care for her children throughout the years, and the trial court determined that this chance was her last, finding that the termination of her parental rights was in the best interest of B.E.S.D. and T.D.G.

Upon considering the emotional and physical danger to the children now and in the future, the emotional and physical needs of the children now and in the future, both of which apply equally to T.D.G.'s father, the mother's substance abuse,

extensive history with the Department, her refusal to address the issues that caused the Department's years of involvement, and like T.D.G.'s father, her inactions, we hold that the evidence is legally and factually sufficient to support the trial court's findings that termination of each parent's parental rights is in the best interest of the children.  *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72; *J.S.*, 687 S.W.3d at 554.

Accordingly, we overrule the mother's issue on appeal.

*This Court's Ruling*

We affirm the order of the trial court.

W. STACY TROTTER

JUSTICE

May 21, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.